# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 16-70021

———

RICK ALLEN RHOADES,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

———

Appeal from the United States District Court
for the Southern District of Texas

———

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2019

Lyle W. Cayce
Clerk

Before HIGGINBOTHAM, HAYNES, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In 1992 a Texas jury convicted Rick Allan Rhoades of capital murder and he received a death sentence. After direct appeals and filing an unsuccessful state habeas petition, Rhoades petitioned for federal habeas relief. The district court denied his petition and declined to issue a certificate of appealability ("COA"). We granted a COA on three of Rhoades's claims, accepted further briefing, and heard oral argument. We now affirm the district court's denial of his petition.

No. 16-70021

I.

On the morning of September 13, 1991, the bodies of brothers Charles and Bradley Allen were discovered by a neighbor. Almost a month later, Rhoades was arrested leaving the scene of an unrelated school burglary. While in custody for the burglary, Rhoades gave the police a written statement admitting to killing Charles and Bradley Allen.

In that statement, Rhoades related his activities on release from prison in Huntsville, Texas less than 24 hours before the murders occurred. Instead of reporting to his assigned halfway house in Beaumont, Rhoades travelled to Houston by bus. After an unsuccessful search for his parents, he went to an apartment complex where he had previously lived and proceeded to have several beers. In his statement, Rhoades recalled wandering around the neighborhood and encountering Charles Allen outside of his home around 2:30 a.m. After a quarrel, Charles entered his house. Believing he was planning to retrieve a gun, Rhoades went into the house after him. Rhoades picked up a small metal bar from a weight bench and entered the kitchen, where Charles Allen grabbed a knife. The men began fighting and Rhoades recounted hitting Charles Allen with the bar several times until he dropped the knife. At that point, Rhoades grabbed the knife and stabbed him a number of times. Bradley Allen entered shortly thereafter and started trying to punch Rhoades, who stabbed Bradley Allen with the knife. Rhoades took some cash and clean clothing, because his clothes had been bloodied. He saw on the news later that morning that the two men had died. In his statement, Rhoades mentioned that he had not told anyone about the murders and it had been "bothering [him] ever since." Rhoades claimed he could have outrun the police officer who arrested him for the school burglary, but was "tired of running" so decided to tell the police about the murders while in custody.

2

No. 16-70021

A Harris County jury convicted Rhoades of capital murder on October 2, 1992. During the punishment phase of the trial, the State presented evidence of Rhoades's Naval court-martial for unauthorized absences and other previous criminal convictions including convictions for burglary and auto theft. The State also presented Rhoades as a danger to other prisoners, proffering evidence that when Rhoades was an inmate in an Indiana prison, prison officials had recovered a shank and a razor blade from his cell. Between 1986 and 1990 Rhoades stacked up various arrests and convictions for auto theft, possession of a prohibited weapon, theft, burglary, and carrying a weapon. During the punishment phase, Rhoades's trial counsel presented the testimony of Patricia Spenny, Rhoades's birth mother; Donna and Ernest Rhoades, Rhoades's adoptive parents; Meyer Proler, an assistant professor of physiology and neurology at the Baylor College of Medicine; Novella Pollard, Rhoades's teacher in his prison GED program; and Windel Dickerson, a psychologist. On rebuttal, the State presented testimony of David Ritchie, the Harris County jailer and Roy Smithy, an investigator with the special prosecution unit in Huntsville who testified about prison procedures.[1]

On October 8, 1992, the jury answered two requisite questions: (1) whether Rhoades "would commit criminal acts of violence that would constitute a continuing threat to society" and (2) whether there were "sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." The jury unanimously answered "yes" to the first and "no" to the second and Rhoades

---

[1] The testimony of the punishment phase witnesses will be discussed in more detail with the first and second issues certified on appeal. Rhoades challenges the trial court's exclusion of childhood photographs during the punishment phase and the admission of testimony by Smithy regarding an inmate's ability to receive a furlough when serving a life sentence.

received a sentence of death. The trial court denied Rhoades's motion for a new trial in December 1992.

On direct appeal, Rhoades raised eighteen points of error. The Texas Court of Criminal Appeals ("CCA") affirmed Rhoades's conviction and sentence in a published opinion in 1996.[2] Rhoades initiated state habeas proceedings the following year, raising thirty-eight grounds of error. Finding that there were unresolved factual issues, the state habeas court ordered trial counsel to file affidavits responding to Rhoades's allegations of ineffective assistance of counsel. The affidavits of James Stafford and Deborah Keyser were timely filed and the State filed its answer to Rhoades's habeas petition in October 2000. Nearly fourteen years later, the trial court entered its findings of fact and conclusions of law, denying Rhoades's state habeas petition. The CCA affirmed the denial in 2014.[3] With federally appointed counsel, Rhoades filed his federal habeas petition, raising five issues. The State filed a summary judgment motion in response and the district court entered an order denying Rhoades's petition, granting the State's summary judgment motion, and denying Rhoades a COA.

We granted a COA on three of Rhoades's claims for habeas relief: (1) that the convicting court unconstitutionally prevented him from presenting mitigating childhood photographs of himself to the jury during the sentencing phase; (2) that the convicting court unconstitutionally permitted the jury to hear testimony about the possibility of release on furlough for capital defendants sentenced to life in prison; and (3) that the State violated *Batson*

---

[2] *Rhoades v. State*, 934 S.W.2d 113 (Tex. Crim. App. 1996).

[3] *Ex Parte Rhoades*, No. WR-78,124-01, 2014 WL 5422197 (Tex. Crim. App. Oct. 1, 2014).

4

No. 16-70021

when it exercised racially motivated peremptory strikes against two prospective jurors.[4] We address each issue in turn.

## II.

First, Rhoades argues that the trial court erred in excluding eleven photographs from Rhoades's childhood offered as mitigation evidence during the sentencing phase of trial. Before calling Rhoades's adoptive mother, Donna Rhoades, trial counsel sought to introduce photographs of Rhoades as a child from the ages of approximately four to ten.[5] Trial counsel argued that the photographs were admissible to counteract the dehumanizing photographs of Rhoades introduced by the State (e.g., his mugshots), to show the jury the defendant's development through his life and his human side, and to offset the effect of the emotional photos of the deceased victims and their families. The photographs depict typical childhood scenes such as Rhoades holding a trophy, fishing, and attending a dance. The State objected to the admission of the photographs as irrelevant, arguing that everyone was a child at one point, and that the photos did nothing to lessen his moral blameworthiness. The trial court agreed.[6] The CCA affirmed, holding that the trial court did not abuse its discretion in excluding the photos as irrelevant.[7] Specifically, the CCA held that there was no relationship between photos of Rhoades as a child and his moral culpability for the double murder.[8] On habeas review, the state court

---

[4] *Rhoades v. Davis*, 852 F.3d 422, 427–28 (5th Cir. 2017).

[5] There was one more recent photo trial counsel sought to introduce.

[6] Trial counsel offered the photos as a bill of exception, suggesting that the trial court had denied Rhoades effective assistance of counsel by impeding trial counsel's ability to humanize Rhoades and show his development as a child.

[7] *Rhoades*, 934 S.W.2d at 126. As we recognized in our decision to grant a COA to Rhoades on this issue, the issue of relevancy divided the CCA and Judges Clinton and Overstreet filed a dissenting opinion criticizing the majority's view that mitigating evidence is relevant "only if it reflects on the moral culpability of the defendant." *Id.* at 130–31 (Clinton, J., dissenting).

[8] *Id.* ("In our view, photographs of appellant which depict a cheerful early childhood are irrelevant to appellants moral blameworthiness for the commission of a violent double-

5

summarized the testimony of witnesses who testified on Rhoades's behalf during the punishment phase of the trial[9] and determined that trial counsel was able to submit other mitigating evidence that humanized Rhoades.[10] In his state habeas petition, Rhoades focused on the special issue of future-dangerousness, arguing that the photographs showed his ability to adapt to a structured environment.[11] The state habeas court rejected that contention, finding that the "childhood photos are not relevant to the issue of whether the applicant would be a threat to society while living in a structured environment and do not show whether he would or would not commit future acts of violence."

The district court concluded that the state courts were not unreasonable in determining that the proffered photos were irrelevant to the jury's determination of the special issues[12] and that any error was harmless because the photographs would have been "only a small thread in an intricately violent mosaic of Rhoades' life."[13] The district court found persuasive the State's argument that any mitigating value of the photos would be eclipsed by the

---

murder because such evidence has no relationship to appellant's conduct in those murders. That appellant was once a child does not diminish his moral culpability for the act of murder.").

[9] The court summarized evidence of his difficult childhood pre-adoption, including "being almost drowned by one of his mother's boyfriends" and the transition to his adoptive family when Rhoades hid food, defecated in the closet and drawers, and had a difficult time concentrating at school. The court summarized the evidence of his family life after transitioning to his adoptive family, including being "loving to everyone after his adoption" and "being 'gung-ho' into sports."

[10] "The Court finds that trial counsel were able to present mitigating evidence and to humanize [Rhoades] through punishment testimony concerning his childhood and background, rather than a photo that does not adequately inform the jury of his life."

[11] "These pictures, and evidence on his life while in boot camp and while incarcerated, showed the jury that he could adapt and conform in a structured society."

[12] *Rhoades*, 2016 WL 8943327, at \*8 ("The state courts could reasonably conclude that the childhood photographs bore little, or no, relationship to Rhoades' character, record, or circumstances of the offense. The photographs merely showed that Rhoades had once been a child, and possibly a happy one. The photographs, however, were not demonstrative of trial testimony, nor did they play a direct role in the decision jurors faced.").

[13] *Id.*

aggravating nature of the photos—essentially that Rhoades committed brutal murders *despite* being adopted into a loving family.[14]

It is our task to assess whether the state court's determination that the proffered childhood photos were irrelevant was an unreasonable application of clearly established federal law.[15] The Supreme Court has adopted an expansive definition of relevant mitigation evidence.[16] "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."[17] A state court cannot, therefore, exclude evidence from the jury's consideration "if the sentencer could reasonably find that it warrants a sentence less than death."[18] This is a "low threshold for relevance."[19]

In *Lockett v. Ohio*, a plurality of the Court concluded that Ohio's death penalty statute was invalid because it did not "permit the type of individualized consideration of mitigating factors [the Court held] to be required by the Eighth and Fourteenth Amendments in capital cases."[20] The Court determined that the Constitution required that the sentencer "not be precluded from considering, *as a mitigating* factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the

---

[14] *Id.*

[15] 28 U.S.C. § 2254(d).

[16] *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (reiterating that when addressing "the relevance standard applicable to mitigating evidence in capital cases . . . [the Court speaks] in the most expansive terms").

[17] *Id.* (citing *McKoy v. North Carolina*, 494 U.S. 433 440–41 (1990) (quoting the dissenting state court opinion with approval) (internal quotation marks omitted)).

[18] *Id.* at 285 (citing *McKoy*, 494 U.S. at 441 (internal quotation marks omitted)).

[19] *Id.*

[20] *Lockett v. Ohio*, 438 U.S. 586, 606 (1978). It is worth noting, briefly, that in *Lockett* and its progeny, the Court was tasked with considering the constitutionality of state statutes that limited the sentencer's consideration of already *admitted* evidence. Here, we consider an antecedent problem: whether the trial court erred in excluding relevant mitigating evidence in the first instance. The *Lockett* line of cases more generally explain the standard for relevant mitigating evidence, and therefore apply with equal force here.

defendant proffers as a basis for a sentence less than death."[21] Four years later, the Court endorsed the plurality opinion in *Lockett* and held that a trial judge had erred in concluding that a defendant's violent upbringing and background was not relevant mitigating evidence.[22] Even where mitigating evidence does not "relate specifically to [the defendant's] culpability for the crime he committed," it may still be relevant as mitigation if the jury could draw favorable inferences regarding the defendant's character and those inferences "might serve 'as a basis for a sentence less than death.'"[23] *Lockett*, *Eddings*, and *Skipper* "emphasized the severity of imposing a death sentence and [made clear] that 'the sentencer in capital cases must be permitted to consider *any* relevant mitigating factor.'"[24]

Despite the expansive definition of relevant mitigating evidence, trial judges still retain their traditional authority to exclude irrelevant evidence that does not bear on the defendant's "character, prior record, or the circumstances of his offense."[25] Furthermore, "gravity has a place in the

---

[21] *Id.* at 604.

[22] *Eddings v. Oklahoma*, 455 U.S. 104, 112–14 (1982) ("We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett*. Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentence refuse to consider, *as a matter of law*, any relevant mitigating evidence.").

[23] *Skipper v. South Carolina*, 476 U.S. 1, 4–5 (1986) (quoting *Lockett*, 438 U.S. at 604) (holding that the exclusion of evidence regarding petitioner's good behavior in prison while awaiting trial deprived him of his right to place before the sentence relevant evidence in mitigation of punishment).

[24] *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 248 (2007) (summarizing rule of those cases). While this Court has upheld the exclusion of a singular piece of evidence at the punishment phase, distinguishing *Lockett* and *Eddings* as "deal[ing] with the exclusion of specific *types* of evidence rather than specific *items* in evidence," in that case the court was considering a videotape that was excluded as hearsay under Mississippi law. *Simmons v. Epps*, 654 F.3d 526, 544 (5th Cir. 2011). Here, on the other hand, the trial court excluded an item of evidence as irrelevant, in the face of the Supreme Court's admonition that the sentencer be permitted to consider any relevant mitigating factor.

[25] *Lockett*, 438 U.S. at 604 n.12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.").

No. 16-70021

relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability."[26] This court has not accepted that it is unconstitutional to define mitigating evidence as evidence that reduces moral blameworthiness.[27]

Acknowledging those strictures, Rhoades contends that the state court's finding erroneously defined the universe of evidence relevant to moral blameworthiness too narrowly, undermining the rule established in *Lockett*. We agree. The proffered photos are relevant to Rhoades's character,[28] humanizing Rhoades in the face of Rhoades's long criminal history and suggestions by the prosecution that Rhoades was a psychopath[29] who viewed society's rules as a joke.[30] While photos of Rhoades as a child do not "relate specifically to [Rhoade's] culpability for the crime he committed," they are "mitigating in the sense that they might serve 'as a basis for a sentence less than death.'"[31] We distinguish here between culpability for the specific crime

---

[26] *Tennard*, 542 U.S. at 286–87 (citing *Skipper*, 476 U.S. at 7 n.2 ("We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating. For example, we have no quarrel with the statement of the Supreme Court of South Carolina that 'how often [the defendant] will take a shower' is irrelevant to the sentencing determination.") (internal citation omitted)).

[27] *Blue v. Thaler*, 665 F.3d 647, 667 (5th Cir. 2011) (holding that Texas trial court's jury instructions were sufficient to allow jury to consider mitigating effect of petitioner's good conduct in prison).

[28] *Skipper*, 476 U.S. at 4 ("There is no disputing that this Court's decision in *Eddings* requires that in capital cases 'the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" (citing *Eddings*, 455 U.S. at 110)).

[29] "[The defendant's psychologist] admits that the defendant fits the antisocial personality profile, same thing as psychopath."

[30] "Society the systems' rules, are a joke to him, a challenge, a game."

[31] *Skipper*, 476 U.S. at 4 (quoting *Lockett*, 438 U.S. at 604). The Court has reminded that "a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of *Lockett* and *Eddings*." *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (holding that the Texas special issues allowed adequate consideration of the petitioner's youth). While often

9

committed by Rhoades and his moral culpability more generally. In other words, although the photos do not relate to the circumstances of the crime, they go to his character and distinct identity. While the State is correct in reminding us that gravity has a place in the relevance determination, childhood photos are not "trivial" in the same way as, for example, personal hygiene practices, an inconsequential fact the Court has acknowledged to be irrelevant.[32] Beyond evaluating whether the proffered evidence is trivial, "[t]he Court [has] emphasized that, in assessing the relevance of mitigating evidence, a reviewing court should not weigh the severity or sufficiency of the evidence."[33] We cannot reconcile the mandate that a sentencing court may not preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character that the defendant proffers as a basis for a sentence less than death with the exclusion of the childhood photos by the trial court here.[34]

---

mitigating evidence regarding a defendant's youth seeks to remind a jury of the defendant's turbulent background or the impetuousness that often defines bad decisions by younger offenders, *Johnson*, 509 U.S. at 367–68, we see no reason why photos highlighting positive or humanizing aspects of Rhoades's youth are any less relevant.

[32] *Skipper*, 476 U.S. at 7 n.2.

[33] *Nelson v. Quarterman*, 472 F.3d 287, 301 (5th Cir. 2006) (en banc) (citing *Skipper*, 476 at 7 n.2)).

[34] The State relies on *Saffle v. Parks*, 494 U.S. 484, 492 (1990) in its contention that "Rhoades did not have an unfettered constitutional right to make such an unbridled appeal to the jury's sympathy" through presentation of the childhood photos. In *Saffle*, the Court held that an instruction telling the jury to "avoid any influence of sympathy . . . when imposing sentence" was constitutional. *Id.* at 487. The petitioner in *Saffle* had argued that the *Lockett* line of cases precluded such an antisympathy instruction. *Id.* In rejecting that claim, the Court clarified the holding of *Lockett* and *Eddings*: "There is no dispute as to the precise holding in each of the two cases: that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial. . . . *Lockett* and *Eddings* do not speak directly, if at all, to the issue presented here: whether the State may instruct the sentencer to render its decision on the evidence without sympathy. Parks asks us to create a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider the mitigating evidence." *Id* at 490. The State's reliance on *Saffle* is unavailing. Here, Rhoades's claim goes to the heart of *Lockett* and *Eddings*: *what* mitigating evidence the jury must be permitted to consider.

That said, we need not reach the question of whether the Court's precedent speaks with such clarity as to render its application by the trial court unreasonable under the strictures of AEDPA. Even assuming that *Lockett* and its progeny "squarely establish" "a specific legal rule" that required the admission of these photographs, we agree with the district court that any such error was harmless.[35] Although Rhoades's counsel did not brief the issue of the effect of any error on appeal, during oral argument, counsel suggested that a trial court's exclusion of mitigating evidence is structural error, entitling Rhoades to a new sentencing. We disagree and find that any error was harmless.

To obtain relief on collateral review, a habeas petitioner must establish that a constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict."[36] In *Brecht*, the Court emphasized the distinction between trial error and structural defects, making clear that "[t]rial error 'occurs during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial.'"[37] On the other hand, structural errors warrant automatic reversal because "they infect the entire trial process."[38] Contrary to the assertion during oral argument of Rhoades's able counsel, the decision of the trial judge to exclude the photos as irrelevant, if error, is quintessentially a trial error subject to harmless error review.[39] The scope of the error is readily

---

[35] *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

[36] *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

[37] *Id.* at 629–30 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991) (internal alterations omitted)).

[38] *Id.* at 630.

[39] *See Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) ("We have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth

No. 16-70021

identifiable and we are able to engage in the "narrow task of assessing the likelihood that the error materially affected the deliberations of the jury."[40]

We agree with the district court that the exclusion of the photos did not have a "substantial or injurious effect or influence in determining the jury's verdict."[41] Even if the photos of Rhoades as a young child had led the jury to a positive inference of Rhoades's character, these photos from over a decade earlier would be unable to counteract the aggravating evidence of the previous crimes committed by Rhoades or testimony describing his violent behavior while incarcerated. And the portrayal of a positive adoptive childhood risks cutting against other mitigating evidence presented by trial counsel of Rhoades's difficult childhood—for example, testimony of Rhoades's biological mother that Rhoades had witnessed his mother's rape by his father. The marginal humanizing force of the photos is outweighed by the extensive aggravating evidence and, as the district court noted, backfires to the extent it highlights that Rhoades committed two brutal murders despite his adoption by a loving family. The hard reality is that any positive force of the proffered photographs was overrun by what the district court called "an intricately violent mosaic" of Rhoades's life.[42] We need not conclude that they had no relevance to conclude that Rhoades has not shown how the exclusion of the

---

Amendment violation is limited to the erroneous admission of particular evidence at trial."); *see also Simmons v. Epps*, 654 F.3d 526, 539 (5th Cir. 2011) (applying *Brecht* harmless error test to submission of an invalid aggravating circumstance to the jury). This court's en banc decision in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006) does not dictate otherwise. The *Penry* violation there, which involved jury instructions that prevented the jury from giving full effect to a defendant's already-admitted mitigating evidence, is qualitatively different. *Nelson*, 472 F.3d at 313. Here, the question is not whether the instructions allowed the jury to give effect to the impact of the mitigating evidence, but rather whether the trial judge erred in refusing to admit one piece of mitigating evidence as irrelevant.

[40] *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978).

[41] *Brecht*, 507 U.S. at 637.

[42] *Rhoades*, 2016 WL 8943327, at *8.

12

No. 16-70021

photos had a substantial or injurious effect on the jury's deliberations. He has not met his burden for habeas relief.[43]

## III.

Rhoades contends that testimony adduced by the State during the punishment phase of trial about the possibility of Rhoades's being released on a furlough was constitutional error. In the punishment phase of Rhoades's trial, the State called Roy Smithy, an investigator with the prison system's special prosecution unit.[44] Smithy testified to the classification and housing of prisoners, crimes committed within the prison, and the range of weapons within the prison. The prosecutor then asked about furlough eligibility:

> [State]: If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and, of course, is there on just a life sentence, is there an opportunity for him to get furloughed?
>
> [Smithy]: If he obtained . . . state approved trustee 3 status, then he is eligible for furloughs.
>
> [State]: Just exactly what does a furlough mean?
>
> [Smithy]: You have different types. You have emergency furloughs. You have other . . .

At this point, Rhoades's trial counsel asked for "a running objection to all of this," and the court instructed him to approach the bench. The transcript then reads: "Counsel went to the bench for an off-the-record conference; then the reporter was called to the bench . . . ." The first part of the bench conference was not transcribed by the court reporter.

---

[43] *Brecht*, 507 U.S. at 637 ("Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)).

[44] The special prosecution unit was established to investigate and prosecute all felony offenses that occur inside the prison system. *Id.*

Back on the record, defense counsel argued that "to allow [the State] to go into this stuff and not let me allude to – to let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice." The court responded: "I don't know where your objection is in there. *I understand what your previous objection was.* She has been admonished."[45] Defense counsel objected to "any further questions along this line." The trial judge stated "I am going to allow her to complete her line of questioning. That is all I am going to say."

After this exchange, the prosecution asked Smithy three additional questions about furloughs. Smithy explained:

> [a] furlough is when an inmate is allowed to leave prison unescorted to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency . . . where he, in essence, signs a piece of paper that says that he is going to be released [at] a certain time and that he will go to wherever this emergency is and that he promises he will be back and turn himself back into the unit.

On cross-examination, defense counsel asked Smithy who was responsible for deciding whether an inmate was eligible for a furlough. Smithy agreed that it was "basically the decision of the warden for each particular unit," subject to "certain guidelines . . . set by the overall prison system." Defense counsel then asked Smithy to confirm that "technically speaking, a person who has been convicted of capital murder and is serving a life sentence is technically eligible for a furlough." Finally, defense counsel asked whether Smithy had ever heard of a capital murderer serving a life sentence getting a furlough, and Smithy stated "I have not personally, no sir." In its closing argument, the State did not mention furloughs, but did emphasize that

---

[45] Again, the referenced previous objection was not recorded.

No. 16-70021

Rhoades had been out of prison for less than twenty-four hours when he committed the murder.[46]

In a motion for new trial, defense counsel objected to the State's furlough testimony as misleading. Defense counsel pointed to an administrative directive from TDCJ which stated that the state classification committee (not unit wardens) decide whether an inmate will be released on furlough. Defense counsel characterized the directive as "evidence . . . that an individual convicted of capital murder assessed life imprisonment is not eligible for furlough." The State responded that the prohibition on furloughs for capital murderers only applied to "appropriate reason furloughs," not emergency furloughs. The State then argued that Smithy's testimony referred only to emergency furloughs, and thus "[t]here was nothing misleading or incorrect" about the testimony.

On direct appeal, Rhoades challenged the furlough testimony as misleading. The CCA did not reach the merits, instead holding that Rhoades's claim was waived because "he failed to object to the line of questioning with ample specificity to notify the trial court of his contention."[47]

Rhoades again challenged the furlough testimony in his state habeas application. He separately raised an ineffective assistance of counsel claim with respect to defense counsel's failure to preserve error related to the

---

[46] "On the street less than 24 hours, [Rhoades] went in there, he smashed it, and he slashed and slashed and slashed till nothing was left but blood and death . . . . "Think about it. Less than 24 hours after his release from prison he slaughters two men."

[47] The court elaborated: "In the instant case, appellant objected only to the trial court's decision to preclude issues of parole eligibility from the trial; appellant did not actually object to the State's question regarding emergency furlough. Indeed, the trial court flatly told appellant that it did not comprehend the nature of appellant's objection. Rather than rephrasing the objection in a way that the trial court could fathom, appellant lodged another non-specific objection. Appellant failed to effectively communicate his objection . . . We therefore hold that appellant's complaint regarding the State's questioning is waived for failure to object with specificity."

furlough testimony. To help resolve the ineffective assistance claim, the state habeas court directed Rhoades's trial counsel to file affidavits addressing the furlough objection. In his affidavit, Rhoades's trial counsel stated:

> [T]he 'record' is not representative of the event at all. To the extent that we did not know that the court-reporter was not recording, or that conversations at the bench were not properly placed in the record, I admit error. However, the record, spotty as it might be, certainly reflects our object[ion]s to Roy Smithy's testimony as a whole, and to the furlough issue in particular.[48]

The trial prosecutor later submitted an affidavit stating:

> With regard to the furlough eligibility of Roy Smithy, the applicant's trial counsel objected repeatedly and strenuously to such evidence. I was aware of the nature of the applicant's objections to such testimony, and I believe that the trial court was also aware of such objections, even if such objections did not make it to the written record.

The state habeas court accepted this version of events when it found that "the trial court's reference to understanding counsel's 'previous' objection is a reference to trial counsel's objection to Smithy's testimony made during the unrecorded portion of the bench conference," and therefore that trial counsel was not ineffective.[49] Yet on substantive challenge to Smithy's testimony the state habeas court found that "the applicant is procedurally barred from advancing his habeas claims concerning Roy Smithy's testimony about prison furloughs" because "trial counsel's complaint . . . was not specific, so the complaint was waived." The state habeas court then found:

---

[48] The defense's co-counsel filed an affidavit stating the same recollection.

[49] "The Court finds that, on direct appeal of the applicant's conviction, the Court of Criminal Appeals was bound by the parameters of the appellate record which did not include the contents of the unrecorded portion of the bench conference when trial counsel objected to Smithy's furlough testimony. . . . The Court finds that trial counsel are not ineffective for allegedly failing to object to Smithy's admissible testimony, just as trial counsel are not ineffective for not moving to strike Smithy's testimony or requesting a limiting instruction."

No. 16-70021

> In the alternative, based on trial counsel's habeas assertion that counsel specifically objected to the furlough testimony during an unrecorded bench conference, the applicant is not procedurally barred from presenting his habeas claims, but the applicant fails to show that such claims have merit.

On federal habeas, the district court elected to "bypass [the] procedural-bar argument" because the claim could be "resolved more easily by looking past any procedural default."[50] The district court proceeded to the merits and concluded that "while not a likely occurrence, Texas law did not preclude life-sentenced capital inmates from furlough eligibility" and that "the Supreme Court has not precluded [s]tates from presenting factually correct, yet unlikely, testimony relating to furlough."[51]

Rhoades argues on appeal that his furlough claim is not procedurally barred and that the state court's determination that Rhoades had failed to show that the furlough testimony was false or misleading was unreasonable. With respect to the procedural bar, Rhoades contends that the state habeas court's finding on his ineffective assistance of counsel claim that trial counsel objected to Smithy's testimony during the unrecorded bench conference (meaning trial counsel was not ineffective), "undid" the CCA's holding on direct appeal that Rhoades had waived his claim by failing to adequately object during trial. Essentially he argues that the state habeas court's finding that the objection was sufficient to overcome the ineffective assistance claim displaces the earlier CCA opinion finding that the objection was insufficient to preserve the issue on appeal.[52] With respect to the state habeas court's finding

---

[50] *Rhoades*, 2016 WL 8943327, at *10 (citing *Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004)). "Given the contested record regarding the defense's trial objection, the Court will address the state habeas court's alternative merits review." *Id.*

[51] *Id.* at 11.

[52] In response, the State devotes much of its briefing to a different argument. In its decision on the substantive furlough claim, the state habeas court decided the claim was

that the substantive furlough claim had been waived, Rhoades contends that those decisions are contradictory: the objection can't be sufficient for one purpose and insufficient for another. If the objection was properly made such that counsel was not ineffective, it was sufficient to preserve the issue on appeal. In response, the State maintains that the issue of the trial counsel's effectiveness with respect to their lodging an objection to the testimony is distinct from the issue of whether the objection was sufficient to preserve any alleged error for appeal.

We agree. If a state court is precluded from reaching the merits of a claim by a state-law procedural default, that claim cannot be reviewed in federal court.[53] "State procedural bars are not immortal, however; they may expire because of later actions by state courts."[54] The Supreme Court has made clear that if the last state court presented with a particular federal claim reaches the merits, that decision removes the procedural bar to federal court review.[55] A procedural default will not bar review of the federal claim on direct or habeas review "unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."[56] The

---

procedurally barred and, in the alternative, meritless. The State contends that the court's decision to address the merits of the furlough testimony challenge in the alternative does not displace the procedural default decision. As Rhoades makes clear in his reply, he is not making that argument and agrees an alternative merits holding does not negate a procedural default holding: "Rhoades's argument is that the CCA's holding—not alternative holding— on his claim that trial counsel was ineffective in failing to properly object to the testimony about furlough is the holding that controls the question of whether trial counsel properly objected." Because Rhoades does not contend that the alternative holding by the state habeas court displaces the procedural default holding, we do not address the argument here.

[53] *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87–88 (1977)).

[54] *Id.*

[55] *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)).

[56] *Harris*, 489 U.S. at 263.

state court is free to reach the merits in the alternative, however, without interfering with the procedural bar.[57]

Here, the last state court to consider Rhoades's claim on the furlough testimony clearly and explicitly held that the claim was procedurally barred.[58] The state habeas court addressed the merits in the alternative, finding that the claim was without merit. The fact that the state court found that trial counsel's objection was sufficient to preclude relief on an entirely separate ineffective assistance of counsel claim does not erase the procedural default on the substantive claim about the furlough testimony. The Supreme Court in *Ylst* made clear that procedural default must be considered with respect to each specific federal claim: "If the last state court to be presented with a *particular federal claim* reaches the merits, it removes any bar to federal-court review that might otherwise have been available."[59] Although the question of whether an objection was lodged is relevant to both the ineffective assistance claim and the substantive furlough testimony claim, a statement about the objection in discussion of one claim does not erase the clear and explicit finding of procedural default on the other.[60]

---

[57] *Harris*, 489 U.S. at 264 n.10 ("Moreover, a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

[58] "On direct appeal of the applicant's conviction, the Court of Criminal Appeals held, based on the appellate record, that trial counsel's complaint about Roy Smithy's testimony concerning prison furloughs was not specific, so the complaint was waived. Thus, the applicant is procedurally barred from advancing his habeas claims concerning Roy Smithy's testimony about prison furloughs."

[59] *Ylst*, 501 U.S. at 801 (emphasis added).

[60] Rhoades also fails to establish "cause and prejudice" for the default. *Murray v. Carrier*, 477 U.S. 478, 493 (1986). He argues that there is cause because the court reporter failed to transcribe the bench conference, faulting either the court reporter or the trial court. While Rhoades is correct that external impediments can provide "cause" sufficient to overcome a procedural default, that is true only where those impediments cannot be ascribed to defense counsel. *Murray*, 477 U.S. at 488. Where counsel was not constitutionally

No. 16-70021

Ordinarily, where the last state court to consider a claim finds that there is a procedural bar, we are precluded from review as a federal court sitting in habeas. But because the distinction made by the state court between the effect of trial counsel's objection as it relates to the ineffective assistance claim versus the substantive furlough testimony claim is admittedly a fine one, and the internal consistency of the state court's findings is debatable, we need not rest on the procedural bar, and proceed to consider Rhoades's substantive argument.

Rhoades contends that the state court's determination that the furlough testimony was not false or misleading was an unreasonable determination of the facts. He argues that because there was no possibility that an inmate convicted of capital murder and sentenced to life in prison would be granted a furlough, Smithy's testimony was false and misleading. The state habeas court found that "Smithy's testimony . . . was not false or misleading" and found "unpersuasive the assertion that [Rhoades's] jury probably considered and speculated as to whether the applicant would receive furlough."

To succeed on his claim for habeas relief, Rhoades must show that the state court's decision was based "on an unreasonable determination of the facts."[61] It is not enough to demonstrate that the decision was incorrect, rather Rhoades must show that the decision was "objectively unreasonable, a

---

ineffective, the Supreme Court has held that it "discern[s] no inequity in requiring [counsel] to bear the risk of attorney error that results in procedural default." *Id.* Here, no external impediment or interference made compliance with the state's contemporaneous objection rule impractical. Trial counsel acknowledged in her affidavit that such compliance was not impractical and her failure to ensure the recording of the objection was her own error. As the CCA reiterated on direct appeal, trial counsel could have rephrased the objection and ensured that such objection was made on the record. *Rhoades*, 934 S.W.2d at 127. Rhoades has not shown cause to excuse the procedural default.

[61] 28 U.S.C. § 2254(d)(2).

substantially higher threshold."[62] "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."[63]

To support his contention that the information about the furlough testimony was not truthful, Rhoades relies on *Simmons v. South Carolina.*[64] In *Simmons*, the Supreme Court held that "where [a] defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."[65] Future dangerousness was a focus of both sides during the punishment phase of Simmons's trial—the prosecution argued that Simmons was a continuing threat and the defense responded that Simmons's dangerousness was limited to elderly women and he would not be violent in a prison setting.[66] To show the jury that Simmons would be confined to prison for life, his counsel requested an instruction that state law made Simmons parole ineligible.[67] The trial judge refused, even after the jury sent a note asking whether a life sentence carried the possibility of parole.[68] The Supreme Court held that the defendant's due process rights were violated.[69]

The refusal of the trial court to instruct the jury that Simmons was parole ineligible led to the jury's "grievous misperception" that it was choosing

---

[62] *Blue*, 665 F.3d at 654 (citing *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) (internal quotation marks omitted)).

[63] *Wood v. Allen*, 558 U.S. 290, 302 (2010).

[64] 512 U.S. 154 (1994).

[65] *Id* at 156.

[66] *Id.* at 157.

[67] *Id.* at 158.

[68] *Id.* at 160. The trial judge answered the jury's question by instructing that it was "not to consider parole or parole eligibility in reaching [its] verdict. . . . The terms of life imprisonment and death sentence are to be understood in their plan [sic] and ordinary meaning." *Id.*

[69] *Id.* at 161.

between a death sentence and a limited period of incarceration.[70] By allowing the prosecution to "raise[] the specter of petitioner's future dangerousness . . . but then thwart[ing] all efforts by petitioner to demonstrate that, contrary to the prosecutor's intimations, he would never be released on parole,"[71] the trial court in *Simmons* sanctioned a death sentence on the basis of information that the defendant "had no opportunity to deny or explain."[72]

In Rhoades's case, on the other hand, defense counsel was permitted to cross-examine Smithy and solicited testimony that he had "never heard of a capital murderer serving a life sentence getting a furlough." The testimony elicited by the prosecution was factually true and Rhoades's trial counsel had an opportunity to "deny or explain" the testimony and show the likelihood of Rhoades actually being furloughed to the jury.[73]   As the Court reiterated in *Simmons*, "nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release."[74] Rhoades attempts to analogize *Simmons*, arguing that the state court's basis for not giving an instruction that the defendant was parole ineligible in that case was that no statutory law prohibited an inmate from being furloughed or given work release. But the Court expressly noted that while no *statute*

---

[70] *Id.* at 162.

[71] *Id.* at 165.

[72] *Id.* at 161 (quoting *Gardner v. Florida*, 530 U.S. 349, 362 (1977)) ("The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'").

[73] *Simmons*, 512 U.S. at 161 (quoting *Gardner*, 530 U.S. at 362 (internal quotation marks omitted)).

[74] *Id.* at 168; *see also California v. Ramos*, 463 U.S. 992, 994 (1983) (upholding a California law requiring trial judges to inform the jury in a capital case that a sentence of life imprisonment without the possibility of parole may be commuted by the Governor to a sentence that includes the possibility of parole). Rhoades attempts to distinguish *Ramos* by arguing that California governors had actually commuted sentences of life without parole, whereas Texas had never granted a furlough to someone convicted of capital murder. But defense counsel was able to elicit testimony from Smithy that he was not aware of any inmate convicted of capital murder receiving a furlough.

No. 16-70021

prohibited "petitioner's eventual release into society," "state regulations unambiguously prohibit[ed] work-release and virtually all other furloughs for inmates who [we]re ineligible for parole."[75] Here, as the state habeas court recognized, Rhoades would have been technically eligible for emergency furlough had he received a life sentence.[76]

Finally, Rhoades contends that even if the testimony wasn't impermissible when it was given, it later "became false" which entitles him to relief. Rhoades points to an amendment to the furlough statute passed by the Texas legislature three years after his sentence which would require that all emergency furloughs be supervised. Rhoades relies on *Johnson v. Mississippi*, where the Supreme Court considered a death sentence that was predicated on the jury's finding of an aggravating factor—a prior violent felony conviction— where that prior conviction was vacated after his capital trial.[77] In *Johnson*, the jury found an aggravating circumstance that the defendant "was previously convicted of a felony involving the use or threat of violence to the person of another."[78] After sentencing, the New York Court of Appeals reversed his prior felony conviction.[79] Nonetheless, the Mississippi Supreme Court

---

[75] *Simmons*, 512 U.S. at 167 n.6.

[76] "The Court finds . . . that temporary furloughs were available to prison inmates and capital murderers serving a life sentence." The state habeas court noted that the one piece of testimony given by Smithy that was objectively false was his statement on cross-examination that prison wardens decide who is furloughed. The TDCJ administrative directive submitted as part of Rhoades's motion for a new trial makes clear that the State Classification Committee, rather than the warden, considered inmates for furloughs. The state habeas court found that "this administrative difference does not affect the substance of Smithy's testimony about capital murderers serving life sentences being eligible for furlough and is not 'materially misleading.'" We agree. The identity of the decision-maker is irrelevant to Rhoades's complaint: that Smithy's testimony allowed the jury to speculate as to whether the applicant would receive a furlough and caused them to choose the death penalty.

[77] *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988).

[78] *Id.* at 581.

[79] *Id.* at 582.

denied Johnson postconviction relief.[80] The Supreme Court reversed, finding that the "New York conviction provided no legitimate support for the death sentence imposed on petitioner" and that "the use of that conviction in the sentencing hearing was prejudicial."[81] The effect of the New York Court of Appeals' decision was that the New York judgment was not valid at the time the Supreme Court considered the case *and* it "was not valid when it was entered in 1963." Here on the other hand, while the furlough testimony would not have been accurate if given after the legislative amendment, it *was* valid at the time it was given and a subsequent change to the statute did not make the earlier testimony—based on an earlier version of the law—invalid. A change in statute is fundamentally different from an invalidated criminal conviction: the criminal conviction was never valid whereas the pre-amendment statute was. *Johnson* does not dictate the relief Rhoades requests.

## IV.

In his last claim for habeas relief, Rhoades argues that the district court erred by failing to conduct a comparative analysis with respect to his *Batson* claim.[82] In his application for a COA, Rhoades challenged the district court's

---

[80] *Id.* at 583.

[81] *Id.* at 586.

[82] *Batson v. Kentucky*, 476 U.S. 79 (1986). There is some confusion in Rhoades's briefing on this point. Although his point heading argues that "[t]he district court abused its discretion in failing to conduct the comparative analysis," Rhoades later contends that "[t]he failure of the *state court* to conduct this sort of comparative analysis was an unreasonable application of federal law or an unreasonable determination of the facts, or both, and the failure of the court below to conduct comparative analysis was error." In other words, Rhoades seems to argue simultaneously that the state court and district court erred in not doing a comparative analysis. In response to the State's Fed. R. App. P. 28(j) letter advising this panel of the court's en banc decision in *Chamberlin v. Fisher*, 885 F.3d 832 (5th Cir. 2018) (en banc), Rhoades submitted a letter purporting to clarify his position. *See* Apr. 11, 2018 28(j) response. Rhoades states that while *Chamberlin* declined to hold that *Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-El II*"), required a *state court* to conduct a comparative juror analysis, Rhoades was arguing that it was the *district court* who failed to conduct a comparative analysis and therefore *Chamberlin* was not controlling. *See* Apr. 11, 2018 28(j) response at 2.

substantive determination that the state court was not clearly erroneous in finding that there was no *Batson* violation. In his brief, Rhoades has shifted ground—arguing that the error was the district court's failure to conduct a comparative analysis. Although Rhoades does not present any comparative argument or explain what he expects a comparative analysis to show, he contends that the district court's failure to conduct such an analysis is itself error requiring remand. At oral argument, Rhoades's counsel acknowledged that remand may not be necessary because we could engage in our own comparative analysis, referring us to the briefing in the district court.

At the outset, we note that there is some debate about whether the district court actually conducted a comparative analysis. During argument, the State suggested that because the district court had a comparative analysis briefed before it and concluded that the *Batson* claim was without merit, that was sufficient.[83] In the alternative, the State contends we can resolve this question without remanding the case back to the district court after conducting our own comparative analysis. We agree.[84] So, despite the parties' disagreement over whether the district court was required to do a comparative

---

[83] In *Chamberlin*, this court held that a Mississippi state court had conducted a comparative juror analysis, finding sufficient the state court's statement that it conducted a "thorough review of the record . . . including the jury questionnaires provided by Chamberlin" and had found no evidence of "disparate treatment of the struck jurors." *Chamberlin*, 885 F.3d at 839 (citing *Chamberlin v. State*, 55 So. 3d 1046, 1051–52). In other words, the court's statement that it had reviewed the record and did not find disparate treatment of the struck jurors, without any comparisons of particular jurors, was sufficient to constitute a comparative analysis. *Id.* ("[R]egardless of whether it was required to so, the Mississippi Supreme Court *did* conduct a comparative juror analysis in Chamberlin's case, albeit in a postconviction proceeding instead of on direct appeal.").

[84] *See Fields v. Thaler,* 588 F.3d 270, 276–77 (5th Cir. 2009) (determining that the court need not resolve the question of whether the Texas court actually engaged in a comparative analysis because the decision of the court that the defendant "had not shown disparate treatment with respect to the strikes of [the contested jurors] [was] not unreasonable").

analysis after *Chamberlin*,[85] whether the district court actually performed a comparative analysis,[86] and whether Rhoades's brief was adequate for us to consider his comparative analysis claim, the answer here is simpler: Rhoades's proffered comparisons do not lead to his desired result. After review of the voir dire record, we find that the state courts' decision that there was no *Batson* violation in the peremptory strikes of Mr. Randle and Ms. Holiday was not unreasonable.

The *Batson* analysis proceeds in three steps: (1) a defendant must present a prima facie case that the prosecution exercised peremptory challenges on the basis of race;[87] (2) the burden then shifts to the prosecutor to present a race-neutral explanation for striking the juror in question;[88] and (3)

---

[85] In *Chamberlin*, this court held that *Miller El II* "did not clearly establish any *requirement* that a state court conduct a comparative juror analysis at all, let alone *sua sponte*." *Chamberlin*, 885 F.3d at 838. Rhoades relies on *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) for his contention that "a federal district court must perform a comparative analysis." *See* Apr. 11, 2018 28(j) response at 2. *See Reed*, 555 F.3d at 373 ("We recently agreed that *Miller-El II* requires us to consider a 'comparative juror analysis' in a *Batson* claim.") (quoting *United States v. Brown*, 553 F.3d 768, 796 (5th Cir. 2008)).

[86] In its decision, the district court considered Rhoades's argument that the prosecutors had questioned Ms. Holiday differently than other prospective jurors by (1) probing her views on the death penalty more deeply and (2) focusing on Ms. Holiday's relationship to someone incarcerated despite the fact that other jurors were related to incarcerated people. The district court concluded: "Given the numerous race-neutral reasons proffered by the State, Rhoades' weak showing of disparate questioning, and the absence of any meaningful evidence of discriminatory intent, the Court finds that Rhoades has not met his AEDPA burden with regard to Ms. Holiday." *Rhoades*, 2016 WL 8943327, at *20. With respect to Mr. Randle, the district court considered Rhoades's argument that other veniremembers that had family members with a criminal history had been seated on the jury. The district court found that the state courts were not unreasonable in determining that there was no *Batson* violation because (1) no other seated juror had a *sibling* who was incarcerated, (2) the State contended that Mr. Randle had not been forthright in his discussion of his brother's incarceration, and (3) Mr. Randle articulated that he would prefer that a defendant have a history of violent acts to justify a finding on the future dangerous special issue. *Id.*

[87] *Batson*, 476 U.S. at 96–97.

[88] *Id.* at 97–98; *Chamberlin*, 885 F.3d at 838 ("At the second step, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered should be deemed race-neutral. The proffered explanation need not be persuasive, or even plausible . . . . The issue is the facial invalidity of the prosecutor's explanation." (quoting *Williams v.*

the court must determine whether the defendant has met his burden of proving purposeful discrimination.[89] In analyzing whether a prosecution's use of peremptory strikes evinces invidious discrimination, the Supreme Court has employed a comparative juror analysis.[90] This court has recently provided a framework for such an analysis and has made clear that *Miller-El II* did not establish a requirement that the state court employ a comparative juror analysis *sua sponte*.[91]

A state court's *Batson* ruling is a finding of fact "accorded great deference" on habeas review.[92] In order to prevail here, Rhoades must show that "[the] trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary."[93] Rhoades challenges the peremptory strikes of two jurors: Berniece Holiday and Gregory Randle.

### Ms. Holiday

In its voir dire questioning, the court asked Ms. Holiday about her job as a second grade teacher, the occupation of her three children, her prior service as a juror in a burglary case,[94] her relationship with a first cousin who had

---

*Davis*, 674 F. App'x 359, 363 (5th Cir. 2017) (unpublished) (internal quotation marks omitted))).

[89] *Id.* at 98.

[90] *Miller-El II*, 545 U.S. at 241 ("More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. . . . While we did not develop a comparative juror analysis last time, we did note that the prosecution's reasons for exercising peremptory strikes against some black panel members appeared equally on point as to some white jurors who served. The details of two panel member comparisons bear this out." (internal citation omitted)).

[91] *Chamberlin*, 885 F.3d at 838.

[92] *Hernandez v. New York*, 500 U.S. 352, 364 (1991).

[93] *Hoffman v. Cain*, 752 F.3d 430, 448 (5th Cir. 2005).

[94] When asked by the prosecutor whether she participated in deciding the penalty in the case, Ms. Holiday responded: "We set him free."

been incarcerated,[95] and her views about capital punishment.[96] The State followed up with additional questions about Ms. Holiday's beliefs on the death penalty, probing whether her questionnaire accurately reflected her views and what she meant by her statement that she had "mixed emotions" about the death penalty.[97] The State then asked Ms. Holiday whether her experience as a teacher led her to believe that children with turbulent childhood were "less responsible" for conduct as adults, to which Ms. Holiday responded that she "believe[d] that is one of the problems." Ms. Holiday informed the prosecutor that her religious beliefs would not keep her from imposing the death penalty. Shortly after Rhoades's trial counsel began questioning Ms. Holiday, the prosecutor exercised a peremptory challenge.

Rhoades's trial counsel then challenged the State's peremptory strike under *Batson*. Trial counsel argued that Ms. Holiday was the first and only black venireperson on that particular panel and that her responses could reasonably be read as pro-prosecution. Although the trial court did not find that Rhoades had made a prima facie case, the judge asked the prosecutor to explain the State's race-neutral reasons for striking Ms. Holiday "[o]ut of an abundance of caution."[98] The trial court acknowledged that by asking the State to provide these reasons, the CCA would proceed in its review as though a

---

[95] Ms. Holiday stated that she believed he was in prison at that time, but was not certain because she was not close to the cousin.

[96] Ms. Holiday noted on her questionnaire that she was strongly in favor of the death penalty, but wished it wasn't necessary. She confirmed that her decision on whether the death penalty should be assessed would depend on the facts and circumstances of the individual case.

[97] Ms. Holiday confirmed that her beliefs tracked what she had written in the questionnaire and that although she had "mixed emotions," she "follow[s] the rules" and believed "that there are some cases if you take a life you should give a life."

[98] Before the prosecutor gave the state's reasons, the trial judge made clear that he thought "the record [wa]s full of information why [Ms. Holiday] would not be a proper . . . juror from the State's standpoint, having nothing to do with her race."

prima facie case had been made. The prosecutor offered several race-neutral reasons for striking Holiday, including:

> (1) she "dozed off a couple of times" during earlier proceedings;
> (2) her answers were "too succinct" and gave the impression that she was "not being open in her answers";
> (3) she only answered three of seventeen questions on the ninth page of the juror questionnaire;
> (4) she answered certain questions with "a little smile" that the prosecutor perceived to mean she was going to say what she thought she needed to say;
> (5) she works with children and "is very much aware of the effect of broken homes and difficult childhood" and thus might "be particularly impressed" by evidence about the defendant's background;
> (6) she had a "real tone of pride" when explaining that, while serving on a previous jury for burglary, she "set free" the defendant;[99]
> (7) one of her daughters had a job that "indicates an interest in rehabilitation"; and
> (8)    she    had    a    first    cousin    in    prison.

Defense counsel responded, noting that numerous people on the panel had dozed off during the voir dire, Ms. Holiday was not close to her cousin in prison, and that the court had seated others on the jury who indicated they agreed with the idea that a troubled childhood could explain later behavior. The trial court observed for the record that it had noted three people napping, one of whom was Ms. Holiday. It proceeded to find that the State's reasons for striking Ms. Holiday were race neutral. On direct appeal, the CCA affirmed, "[u]pon review of the record, this [c]ourt is not left with a definite and firm conviction that error was committed. [Rhoades'] showing of purposeful discrimination was minimal. The State's race-neutral explanations were not

---

[99] The prosecutor described this as the "thing that weighed most heavily" in the state's decision to strike Ms. Holiday.

whimsical, . . . and the record does not reflect that the State demonstrated a disparate pattern of strikes against any suspect class."[100]

In his habeas petition before the district court, Rhoades argued that the State probed Ms. Holiday's views on the death penalty in an "uncharacteristic manner," questioning her about her family's feelings and whether her religious beliefs would interfere with her ability to impose a sentence of death. Rhoades averred that there was an "extreme difference" in the pattern of questioning. Finally, Rhoades contended that the race-neutral explanations for the strike were not supported by the record because other seated jurors had a family member with a criminal conviction and several indicated that they believed a turbulent childhood could explain later behavior.

### *Mr. Randle*

With respect to Mr. Randle, the trial court questioned him during voir dire about his children, his brother's criminal record,[101] his television preferences, and his views on the death penalty.[102] The State then asked more questions about his views on the death penalty, whether he would require a motive to convict, his family's views on the death penalty,[103] his interactions with his brother,[104] his views on psychologists and expert witnesses, whether a difficult childhood reduces someone's moral culpability as an adult, and

---

[100] *Rhoades*, 934 S.W.2d at 124.

[101] Randle indicated that he did not know what his younger brother was arrested for, though he had visited him once in prison. Randle explained that his brother "ran away from home at an early age," and he only learned of the criminal case when his brother was already incarcerated..

[102] The court summarized Randle's questionnaire responses, stating "it appears you are basically opposed to capital punishment, that you think it's wrong, you really don't believe in it, but you believe it's necessary for some crimes." Randle confirmed, "Right."

[103] The State also asked if Randle's "family or anybody who is close to [him], anybody who matters to [him], . . . who would disapprove if [he] were on a jury that gave the death penalty." Randle answered no, and stated that he is "used to . . . tak[ing] responsibility for himself."

[104] The State asked Randle "[A]re you going to be thinking about: Gee, that could be my brother sitting there? What effect do you think that would have on you?"

concerns about future dangerousness. Defense counsel then asked Mr. Randle questions about his job as a machinist, whether his emotions would lead him to automatically choose the death penalty, his views on expert testimony, and his views on the death penalty more generally.

Defense counsel once again raised a *Batson* challenge, and the court asked the State to provide racially neutral reasons for striking Mr. Randle. The prosecutor responded that Mr. Randle "ha[d] a brother in prison at the present time," that he "professed not to know what offenses the brother had been convicted or what length of sentence the brother was serving" despite having visited him in prison, and expressed concern that this appeared to be "one area of inquiry" where Randle was not very honest. The prosecutor also noted that Randle "wanted a prior criminal act of violence to persuade him that somebody was going to be a continuing threat to society," which the prosecutor could not provide in this case.[105] After defense counsel responded, the trial court found that the strike was exercised for racially neutral reasons.

Again, the CCA affirmed on direct appeal, stating "[g]iven the utter lack of any real evidence that the State purposefully discriminated against Randle in the record, and the relative strength of the State's explanations, we are not left with a definite and firm conviction that a mistake was committed."

In his habeas petition, Rhoades contends that the trial court was unreasonable in denying his *Batson* challenge because of the disparate questioning of Mr. Randle. Rhoades argues that five other seated jurors had been convicted of a crime or had someone close to them convicted but the prosecutor asked only Mr. Randle if he would be putting his brother in the

---

[105] The prosecutor also mentioned that Randle "didn't seem to be too conscientious" about paying child support, but stated "[t]hat certainly didn't rise to the level of the other two things [he] mentioned." The court gave "[no] weight whatsoever to any of the child support comments."

place of the defendant when they considered the special issues. Trial counsel disputed the prosecutor's determination of Mr. Randle's truthfulness and pointed to at least two occasions where Mr. Randle confirmed he would answer the first special issue based solely on the facts of the capital murder case, attempting to refute the prosecutor's argument that Mr. Randle would require prior acts of violence.

At the outset, both parties acknowledge that the record on appeal is incomplete. We do not have a racial breakdown of the entire venire. In terms of numbers, here is what the record tells us: of the prosecution's fourteen peremptory strikes, twelve of the individuals were white and two were black; at the time Ms. Holiday was struck, the prosecutor noted that of the more than 64 veniremembers that had been questioned, Ms. Holiday was the first black veniremember that the State had peremptorily challenged;[106] the seated jurors included ten white individuals and one Hispanic individual; and the race of the final seated juror is not clear from the record. In *Miller-El II*, the Court took account of juror comparisons, statistical data, contrasting voir dire questions, the prosecutor's office policy of systematic exclusion of black jurors, and the prosecutors' use of a "jury shuffle."[107] Here, because of the incomplete record, Rhoades can present only limited juror comparison.[108] As the Supreme Court

---

[106] Again, we do not know the racial composition of the roughly 64 prospective jurors who were questioned before Ms. Holiday.

[107] *Woodward v. Epps*, 580 F.3d 318 (5th Cir. 2009) (citing *Miller-El II*, 545 U.S. at 261–63). A "jury shuffle" is a practice by which either side may reshuffle the cards bearing panel members' names to rearrange the order in which veniremembers are questioned. *Id.* at 253. The Court noted that "the prosecution's decision to seek a jury shuffle when a predominant number of African-Americans were seated in the front of the panel, along with its decision to delay a formal objection to the defense's shuffle until after the new racial composition was revealed, raise a suspicion that the State sought to exclude African-Americans from the jury." *Id.* at 254 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003) (*Miller-El I*) (internal quotation marks omitted)).

[108] *See e.g.*, *Lewis v. Horn*, 581 F.3d 92, 104 (3d Cir. 2009) ("Without information about the number and racial composition of the entire venire, we cannot calculate the exclusion rate and we lack the 'contextual markers' to analyze the significance of the strike rate.").

has acknowledged, however, "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" can be "[m]ore powerful than . . . bare statistics."[109] "If a prosecutor's proffered reason for striking a panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."[110] In conducting this qualitative analysis, we need not "compare jurors that exhibit *all* of the exact same characteristics. If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was pretext for discrimination, even if the two jurors are dissimilar in other respects."[111] The narrow focus in the *Batson* inquiry is on "the actual, contemporary reasons articulated for the prosecutor's decision to strike a prospective juror" and when a prosecutor gives a facially race-neutral rationale for striking a black juror, "a reviewing court must 'assess the plausibility of that reason *in light of all evidence with a bearing on it.*'"[112] Reviewing courts therefore are tasked with testing "the veracity" of "timely expressed neutral reasons."[113] After considering Rhoades's proffered comparisons, we conclude that the state court was not unreasonable in rejecting his *Batson* challenge.

---

[109] *Miller El II*, 545 U.S. at 241.

[110] *Id.*

[111] *Reed*, 555 F.3d at 376 (citing *Miller-El II*, 545 U.S. at 247 n.6).

[112] *Chamberlin*, 885 F.3d at 841 (quoting *Miller-El*, 545 U.S. at 251–52). In *Chamberlin*, this court determined that the district court erred in its conclusion that there had been a *Batson* violation where a white venire member who was seated answered three questions identically to two black venire members who were struck. *Id.* at 840. The district court there did not account for other pro-prosecution responses on the white juror's questionnaire, failing to test the veracity of the race-neutral rationale in light of all evidence bearing on it and conflating the assertion of a post-hoc rationale for striking one juror (impermissible) with the explanation for keeping another (permissible). *Id.* at 840–42.

[113] *Id.*

No. 16-70021

Rhoades primary complaint is that Ms. Holiday and Mr. Randle were questioned differently than the seated jurors. With respect to Ms. Holiday, Rhoades contends that because Ms. Holiday offered no opposition to the death penalty in her written questionnaire or during questioning, the prosecutor "prodded and probed to find a hidden difficulty or conscientious reservation." Rhoades alleges that the prosecutor questioned her about her family's beliefs on the death penalty and religious beliefs. But as Rhoades acknowledges, the State questioned nine of the twelve seated jurors about their friends' or families' views on the death penalty[114] and two of the seated jurors about the teachings of their religious beliefs on the death penalty.[115] Far from evincing an "extreme difference" in the pattern of questioning, the prosecutor's questions about the beliefs of Ms. Holiday's family on the death penalty and her religiosity track closely the questions posed to other jurors. The record simply belies the notion that Ms. Holiday was subjected to disparate questioning. Tasked with testing the veracity of the contemporaneously given race-neutral reasons,[116] we note that Rhoades offers no sincere challenge to most of the prosecutor's stated race-neutral reasons, including the rationale the prosecutor identified as the "thing that weighed most heavily"—the fact

---

[114] For example, several seated jurors, including Mr. Harvill, Mr. Garcia, and Ms. Wilkinson, were asked whether any members of their families held different views about the death penalty, whether anyone close to them would disapprove if they served on a jury that gave a death penalty verdict, and whether they would feel any pressure in that regard. Similarly, Ms. Holiday was asked whether she had talked with her children about their beliefs about the death penalty and if anyone in her family disagreed with her beliefs.

[115] Mr. Garcia was asked whether his Catholicism would prevent him from "being a part of a death penalty verdict," to which he replied "No, I don't think so." To Ms. Holiday, the prosecutor posed a virtually identical question: "I am always concerned to know whether there is anything, any teachings in your church or your religious beliefs that would keep you from giving the death penalty?" Ms. Holiday responded "no."

[116] *Chamberlin*, 885 F.3d at 842.

34

that Ms. Holiday described the result of her previous jury service as "setting a man free" "with a real tone of pride."[117]

With respect to Mr. Randle, Rhoades points to five seated jurors who had been convicted of a crime or had someone close to them convicted and asserts that the prosecutor engaged in disparate questioning because she asked only Mr. Randle whether he would put his incarcerated family member in the place of the defendant. As the district court recognized, none of the five seated jurors Rhoades points to had a sibling who was incarcerated.[118] Instead, of the five jurors Rhoades mentions, only three were actually connected to someone who served time in prison—and the connections were remote: Ms. Duane had a third cousin who was incarcerated when she was a child,[119] Mr. Harville had a friend from high school who had gone to prison,[120] and Ms. Wilkinson's friend of her fiancé was incarcerated for a drug offense.[121] A prospective juror's family member's carceral status has been credited as a race-neutral rationale for a peremptory strike and when comparing seated jurors who a defendant argues were similarly situated, this court has countenanced distinguishing between the crimes of those related to veniremembers.[122] In sum, the state court was not unreasonable in rejecting Rhoades's *Batson* challenges.

---

[117] *United States v. Thompson*, 735 F.3d 291, 297 n.14 ("This court has routinely found demeanor to be a race-neutral justification.").

[118] *Rhoades*, 2016 WL 8943327 at \*20.

[119] Ms. Duane stated that she had not seen her third cousin since she was approximately 12 years old.

[120] Mr. Harville indicated that he did not know what offense his high school friend was convicted of. He stated: "I have never spoken to him about it, but it seems like it was some kind of an oilfield theft of some kind."

[121] Ms. Wilkinson stated that she thought her fiancé's friend had been incarcerated for a drug offense but "didn't even really know him very well."

[122] *United States v. Jimenez*, 77 F.3d 95, 100–01 (5th Cir. 1996) (accepting prosecutor's distinction between a Hispanic juror who was struck due to potential bias against the prosecution because a close relative was convicted by federal prosecutors and two seated jurors with DWI convictions where those convictions did not involve federal prosecutors).

No. 16-70021

V.

We conclude that Rhoades is not entitled to habeas relief and the decision of the district court is AFFIRMED.